**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

MARTIN W. KINGSTON,

      Plaintiff,

v.                              **Civil Action No. 1:11CV20**
                                       **(The Honorable Irene M. Keeley)**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

      This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant" and sometime "Commissioner") denying the

Plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Social

Security Act. The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of

fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P.

86.02.

## I. PROCEDURAL HISTORY

      Plaintiff protectively filed his application for SSI on September 12, 2007, alleging disability

due to degenerative disc disease, depression, myofacial pain syndrome, and neuropathy (R. 189-93,

211, 216)[1]. Plaintiff's application was denied initially and upon reconsideration by the state agency

---

[1]Plaintiff had filed three prior applications. On March 21, 2001, Plaintiff filed an application, which was denied on October 10, 2001, with no further review requested or action taken (R. 74). On February 12, 2003, Plaintiff filed his applications for DIB and SSI, which were denied initially and upon reconsideration. A hearing was requested and ALJ Karl Alexander conducted the hearing on January 29, 2004. On May 10, 2004, ALJ Alexander issued a decision, finding

(R. 108-09). Plaintiff timely requested a hearing, which Administrative Law Judge George A. Mills, III ("ALJ"), held on August 26, 2009, and at which Plaintiff, represented by counsel, and Vocational Expert Eugene Tuchman ("VE") testified (R. 28-68). On September 24, 2009, the ALJ entered a decision finding Plaintiff was not disabled because there were light jobs in the national and local economies that he could perform (R. 12-24). Plaintiff appealed the ALJ's decision to the Appeals Council, which denied his request for review on January 4, 2011, making the ALJ's decision the final decision of the Commissioner (R. 1-8).

## II. FACTS

Plaintiff was born on December 18, 1964, and was forty-five (45) years old at the time of the August 26, 2009, administrative hearing (R. 189). Plaintiff's past work included small engine mechanic, marina electrician, assembly mechanic, and fork lift operator (R. 217). Plaintiff completed eleventh grade of high school (R. 223).

Beverly Epstein, M.D., completed a consultative examination of Plaintiff on January 4, 2007. Plaintiff's chief complaint was for "mid thoracic pain with 'acute attacks every three to four days with spasms and sweating.'" Plaintiff stated he experienced "intermittent tingling from that mid thoracic area in the chest down into the groin and his legs." Plaintiff reported he smoked. Plaintiff

---

Plaintiff was not disabled (R. 74-84). Then on June 24, 2004, Plaintiff protectively filed an application for SSI, claiming disability since May 15, 1996. The application was denied initially and upon reconsideration. Plaintiff requested a hearing, which ALJ Alexander conducted on December 29, 2005. On June 5, 2006, ALJ Alexander issued a decision, finding Plaintiff was not disabled (R. 92-104). Plaintiff requested review of the decision by the Appeals Council; that request was denied (R. 33). The undersigned concludes that the previously decided period, May 15, 1996, through June 5, 2006, will not be reconsidered in this decision. (See *Albright v. Commissioner*, 174, F.3d 473, 476)("[T]o the extent that a second or successive application seeks to relitigate a time period for which the claimant was previously found ineligible for benefits, the customary principles of preclusion apply with full force.")

medicated with Lidoderm, Duragesic, Neurontin, Baclofen, and Prozac. Plaintiff stated he had had three epidural injections "a month and a half ago that made his legs feel looser, but did not help with any of his pain." Dr. Epstein found Plaintiff was oriented, had negative Romberg, had normal motor at 5/5, had normal sensation, had normal proprioception and graphesthesia, had normal deep tendon reflexes, and had normal gait (R. 271). Dr. Epstein diagnosed "T 7-8 degenerative disk disease not causing any nerve root compression or spinal stenosis"; "degenerative disk disease of the lumbosacral spine at L1-L2 and L4-L5, not causing any nerve root compression"; mild kyphoscoliosis, and thoracic sprain with spasm. Dr. Epstein opined that Plaintiff was not a surgical candidate. Dr. Epstein referred Plaintiff "on to neurology to see what they think" (R. 272).

On January 11, 2007, Arvind Vasudevan, M.D., and Gauri Pawar, M.D., of the Department of Neurology at West Virginia University, corresponded with Dr. Epstein. They wrote that Plaintiff complained of numbness and tingling in his legs, stomach, groin; intense sweating; balance problems; and jerking and kicking in his sleep. Plaintiff stated he had experienced these symptoms for the past seven (7) years. Plaintiff reported a MRI "of his mid back at that time as well as his lower back" showed no "problems"; however this conclusion "could be an error" (R. 273). Plaintiff neurological examination was as follows: cranial nerves intact, hesitant and stiff gait; "questionable dysmetria on finger to nose"; hyperesthesia in the right T10 level; decreased pinprick and vibration distally over lower extremities; normal muscle tone; and 5/5 muscle strength. Drs. Vasudevan and Pawar noted Plaintiff's old records showed "his T-spine from February 7, 2001, was normal, and on June 20, 2005, he had lumbar spine film, which showed an L1-L2 disk bulge. CT of his head on September 15, 2006, was normal" (R. 273-74). Drs. Vasudevan and Pawar found Plaintiff "may have a myelopathy as well as a generalized peripheral neuropathy and may be a small fiber as his

3

EEG was negative." They further opined Plaintiff "may have subacute combined degeneration." The ordered a MRI of Plaintiff's cervical and thoracic spines (R. 274).

On February 15, 2007, Plaintiff had a MRI of his cervical spine. It showed a "broad-based disk protrusi[on] . . . but no significant spinal stenosis" at C4-C5; "[s]imilar mild disk bulge and osteophytes . . . at the C5-C6"; "mild left-sided foraminal stenosis at the C5-C6 and right-sid[e] C6-C7 levels"; and no findings to "indicate a myelopathy." There was "no abnormal enhancement." The impression was for "mild degenerative changes" (R. 277).

Plaintiff's February 15, 2007, MRI of his thoracic spine showed "[v]ery mild degenerative changes, otherwise unremarkable. [N]o spinal cord signal abnormality [was] seen (R. 278).

On April 12, 2007, Dr. Vasudevan and Dr. Pawar corresponded with Dr. Toney. They wrote that Plaintiff's EMG was negative. Plaintiff's T-spine and C-spine did "not really show[] us a reason for his neuropathy." Drs. Vasudevan and Pawar noted Plaintiff's MRI of his lower back "did not seem to show any problems." They did a "workup (sic), including B12, TSH, SPEP and hemoglobin A1c," which was negative. Plaintiff's muscle tone was normal and his muscle strength was 5/5. Drs. Vasudevan and Pawar diagnosed "small fiber neuropathy, though, [Plaintiff] [did] have some central nervous system findings with some increased reflexes, but both his toes go down." Drs. Vasudevan and Pawar recommended a pain consultation. They did not feel that multiple sclerosis was" the case with him." Plaintiff was placed on Lyrica and his prescription for Neurontin was stopped (R. 275-66).

Plaintiff was treated at the United Pain Management Clinic on June 25, 2007, for back pain. He was prescribed Neurontin, Cymbalta and Skelaxin. Plaintiff reported he slept for four (4) to six (6) hours per night (R. 283-84).

Plaintiff was treated at the United Pain Management Clinic on July 26, 2007, for persistent pain. He was prescribed Cymbalta, Baclofen, Neurontin, and Skelaxin. Plaintiff reported "some improvement" with Cymbalta, but Skelaxin did "not help him." Plaintiff stated he slept from five-to-seven (5-7) hours per night (R. 281-82).

On September 26, 2007, Plaintiff was treated at the United Pain Management Clinic for persistent back pain. He reported he slept between four (4) and seven (7) hours per night. He was prescribed Neurontin, Cymbalta, Baclofen, and Duragesic (R. 279-80).

On September 26, 2007, Plaintiff presented to Dr. Steve Toney for "follow-up of back pain." Dr. Toney noted Plaintiff was being treated at United Pain Management Clinic. Dr. Toney's examination was normal (R. 357).

On December 7, 2007, Thomas Stein, Ed.D., completed a Mental Status Examination of Plaintiff. Dr. Stein noted Plaintiff drove for one-half hour to the examination. Plaintiff's posture was leaning. He shifted his posture when standing or seated. His gait was "very slow and unsteady." Plaintiff did not ambulate with assistive devices. Plaintiff described his pain as "stabbing . . . in the middle of [his] back." "Standing, sitting, walking, bending, and lifting all made the pain much worse." Plaintiff stated the more he was "up, the worse the pain [got]." Plaintiff stated his pain increased as the "day progress[ed]." Plaintiff stated he had difficulty "keeping balance" when he attempted to walk (R. 285). Plaintiff stated his concentration was "affected because the pain [was] so intense" and he was depressed because he was not "able to do stuff." Plaintiff reported awakening frequently. He described his mood as "'bummed out.'" His energy level was poor; he had no current suicidal ideations; he was "phobic about 'becoming homeless'"; and he had no panic attacks, obsessive thinking or compulsive behaviors. Dr. Stein reviewed "some outpatient medical notes"

5

and "a consultation from the West Virginia Department of Orthopedics," dated October 4, 2007. Dr. Stein noted Plaintiff was being treated for degenerative disk disease, chronic back pain, neuropathy, myofacial pain syndrome, and depression; Plaintiff medicated with Duragesic patch, Lidocaine patch, Neurontin, Baclofen, Skelaxin, Cymbalta and Prozac. Plaintiff reported smoking one-half package of cigarettes per day. Plaintiff reported drinking two glasses of wine per year and not experimenting with illegal drugs. Plaintiff stated he had received treatment for his depression from 2003 to present; he had received no inpatient treatment. He was being treated with medication by his primary care physician for depression at the time of the evaluation (R. 286). Plaintiff reported he left school after completing the eleventh grade; he did not obtain his GED. Plaintiff stated he had worked from 1991 to 1994, repairing chain saws and small engines, but quit due to poor wages. Plaintiff reported he last worked as a truck driver from May, 2007, to June, 2007, but left that employment due to back pain. Plaintiff stated he had not worked since 2000 (R. 287).

Upon examination, Plaintiff's speech was normal; he was oriented, times four (4); his mood was mildly depressed; his affect was subdued; he had no thought processing or thought content deficiencies; he had no hallucinations; his insight was adequate; his judgment was average; his immediate and remote memories were mildly deficient; his recent memory was moderately deficient; and his concentration was poor (R. 287-88). Dr. Stein listed Plaintiff's "objective symptoms" as "cooperative, polite, and subdued, mildly depressed, low average intelligence, with average memory, mild concentration impairment, average judgment and insight." He diagnosed the following: Axis I – major depression, recurrent, nonpsychotic and pain disorder associated with general medical condition (R. 288).

Plaintiff's activities of daily living were as follows: rose at 8:15 a.m.; cared for his personal hygiene; drank coffee; lay down for one hour and watched television; dressed; "check[ed] the computer"; washed dishes; did laundry; watched more television; prepared and ate sandwich; watched more television; napped for ninety (90) minutes; watched more television; ate dinner, which was prepared by his wife; watched more television; and retired to bed at midnight. Plaintiff stated he showered once per week because it was "such a painful ordeal." Plaintiff stated he occasionally needed help dressing. Plaintiff did not do yard work, garden, or repair automobiles. He occasionally shopped for groceries, ran errands, drove, and walked short distances (R. 288). Plaintiff occasionally sat on his porch; he read; he did not hunt; he did not fish. Plaintiff reported he did not dine in restaurants and rarely socialized. Dr. Stein noted Plaintiff's concentration was mildly deficient; his persistence was mildly deficient; and his pace was moderately slow (R. 289).

On December 14, 2007, Frank Roman, Ed.D. completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff's affective disorders were not severe (R. 295). Dr. Roman listed Plaintiff's affective disorders as depressive syndrome and pain disorder (R. 298). Dr. Roman found Plaintiff had mild restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace. Dr. Roman also found Plaintiff had experienced no episodes of decompensation (R. 305).

On December 17, 2007, Kip Beard, M.D., completed an Internal Medicine Examination of Plaintiff. Dr. Beard noted he had examined Plaintiff in November, 2004, at which time Plaintiff stated he had had "trouble with his back since he was young." Plaintiff reported that since the November, 2004, examination, he had received "some back injections." Plaintiff stated he had "ongoing constant mid to lower back pain that runs into both legs"; "trouble with prolonged sitting,

riding in a car, vibration, jarring, reaching and lifting"; increased back pain if he sleeps wrong"; and

nausea and dizziness caused by pain (R. 290). Plaintiff reported medicating with Duragesic patch,

Lidoderm patch, Neurontin, Baclofen, and Skelaxin (R. 290-91). Plaintiff reported that his pain is

"not completely alleviated" by these medications. Dr. Beard's examination of Plaintiff's pulmonary,

cardiovascular, gastrointestinal, genitourinary, and neurological systems produced normal results (R.

291). Dr. Beard's physical examination of Plaintiff showed he walked with no ambulatory aids or

assistive devices; his gait was mildly stiff; he walked without a limp; he could stand unassisted; he

could rise from a seated position; he could step up on and down from the examination table; he

appeared comfortable while seated; he appeared uncomfortable in the supine position due to back

pain; he could speak, hear and follow instructions without difficulty (R. 292). Dr. Beard's

examinations of Plaintiff's HEENT, neck, chest, abdomen, extremities, cervical spine, arms, hands

knees, ankles, and feet were normal (R. 292-93). Plaintiff's lumbosacral spine and hips examination

produced "moderate pain on forward bending." His flexes were "to 55 degree with normal motion

otherwise." He had no spasm. He could stand on one leg at a time without difficulty. Plaintiff's

straight leg raising test was ninety (90) degrees bilaterally both the seated and supine position.

Plaintiff's hips were without pain or tenderness and had normal range of motion. Neurologically,

Plaintiff had no muscle weakness; his sensation was intact. His deep tendon reflexes were 2+. He

could heel walk, toe walk, tandem walk, and squat (R. 293-94). Dr. Beard found Plaintiff had no

radiculopathy (R. 294). In addition to Dr. Beard's examination of Plaintiff, he reviewed a copy of

his 2004 report; January, 2007, evaluation from the West Virginia Department of Orthopedics;

February, 2007, MRI of Plaintiff's cervical which showed mild degenerative changes; and February,

2007, MRI of Plaintiff's lumbar spine, which showed very mild degenerative changes (R. 291-92). Dr. Beard diagnosed chronic thoracolumbar pain with a history of thoracolumbar strain (R. 294).

On December 26, 2007, Plaintiff presented to Dr. Toney for "follow-up of chronic pain." Dr. Toney noted that Plaintiff had "been to Clarksburgh (sic) pain center, now done there." Plaintiff appeared to be in no distress and was oriented, times three (3). His examination was normal as to his cardiovascular, respiratory, gastrointestinal, and genitourinary systems. Plaintiff's extremities had no cyanosis, edema, varicosities. His peripheral pulses were intact. Dr. Toney diagnosed unspecified backache. He continued Plaintiff's prescriptions for Lidoderm, Prozac, Neurontin, Baclofen, Duragesic, and Cymbalta. He prescribed Flexeril (R. 311, 354-55).

On January 2, 2008, Rabah Boukhemis, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 314). Dr. Boukhemis found Plaintiff could occasionally climb ramps, stairs, ladders, ropes and scaffolds and crawl. He found Plaintiff could frequently stoop, kneel, crouch, and balance (R. 315). Plaintiff had no manipulative, visual or communicative limitations (R. 316-17). Dr. Boukhemis found Plaintiff should avoid concentrated exposure to extreme cold, humidity, vibration and hazards; he found Plaintiff's exposure to extreme heat, wetness, noise, fumes, odors, dusts, gases and poor ventilation was unlimited (R. 317). Dr. Boukhemis evaluated Plaintiff's medications, activities of daily living, and his January 11, 2007, September 26, 2007, and December 17, 2007 examination and treatment records. Dr. Boukhemis reduced Plaintiff's RFC to medium (R. 320).

9

Plaintiff participated in physical therapy on January 14, 17, 21, 24, 28, and 31, and February 4, 2008 (R. 323-25).

On February 7, 2008, Plaintiff reported to his physical therapist that his pain was "not as bad recently." He had "fewer acute attacks of pain." He participated in physical therapy (R. 323).

On February 14, 2008, Plaintiff underwent physical therapy; he reported he had reduced tolerance of his activities of daily living (R. 322).

Plaintiff was "showing [increased] tolerance to ADLs" and was "doing fairly well" during physical therapy on February 11, 2011(R. 323).

On February 18, 2008, Plaintiff reported to his physical therapist he had experienced "several bad spells of pain over the weekend." He participated in physical therapy (R. 322).

On February 22, 2008, Plaintiff reported to his physical therapist he had been "doing fairly well recently." Plaintiff reported he experienced sharp pain, for which he had to rest. He participated in physical therapy (R. 322).

Plaintiff participated in physical therapy on February 25, 2008. He stated that he felt "much better" and that "[b]eing able to exercise ha[d] made ADLs consequently easier to tolerate" (R. 321).

On February 28, 2008, Plaintiff reported to his physical therapist that he was "doing well" and "tolerating ADLs." He participated in physical therapy (R. 321).

On March 4, 2008, Plaintiff participated in physical therapy (R. 321).

On April 1, 2008, Porfirio Pascasio, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Pascasio found Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight

(8) hour work day; and push/pull unlimited (R. 328). Dr. Pascasio found Plaintiff could occasionally climb stamps, stairs, ladders, ropes, and scaffolds and crawl. Dr. Pascasio found Plaintiff could frequently balance, stoop, kneel, and crouch (R. 329). Dr. Pascasio found Plaintiff had no manipulative, visual or communicative limitations (R. 330-31). Plaintiff should avoid concentrated exposure to extreme cold, humidity, vibration, and hazards. Plaintiff's exposure to extreme heat, wetness, noise, fumes, odors, dusts, gases, and poor ventilation was unlimited (R. 331).

On April 4, 2008, Bob Marinelli, Ed.D., affirmed the December 14, 2007, findings of Dr. Roman (R. 335).

On April 21, 2008, Plaintiff received an cervical epidural steroid injection at WVU Pain Clinic. Yeshvant Navalgund, M.D., performed the procedure (R. 341).

On April 28, 2008, Plaintiff presented to Dr. Toney. Plaintiff's examination was normal. Dr. Toney diagnosed unspecified backache; he continued Plaintiff's prescriptions for Prozac, Neurontin, Baclofen, Cymbalta, Lidoderm, Flexeril, and Duragesic (R. 352).

On May 13, 2008, Plaintiff reported to the Physician Assistant at UHA Pain Clinic that his chief pain was in his neck and shoulders. He realized "20% pain relief" with medication. His activity level was the "same" (R. 361, 375).

On June 30, 2008, Dr. Toney treated Plaintiff for chronic pain in his back. Plaintiff reported he had been receiving treatment from the WVU Pain Clinic. He had received an injection and was scheduled to return on July 14; he was "still in sig. amount of pain." Plaintiff's examination was normal. Dr. Toney diagnosed unspecified backache. He noted that "last consult seem[ed] to say no narcotics. Will await pain clinics (sic) rec. for med change"(R. 350-51).

Plaintiff was treated for neck, shoulder and increased mid back pain at UHA Pain Clinic on August 4, 2008 (R. 373).

On September 8, 2008, Plaintiff reported to UHA Pain Clinic with neck and shoulder pain as his chief complaint. Plaintiff stated that while "driving [to the appointment] he hit a speed bump which . . . caused increase[d] pain" (R. 362, 372).

Plaintiff was treated by Dr. Toney on September 30, 2008. Plaintiff reported he was "[s]till fairly well." He had received "injections" and "dose adjustements (sic) of [N]eurontin." Dr. Toney's examination of Plaintiff was normal. He diagnosed unspecified backache and continued Plaintiff's prescriptions for Prozac, Baclofen, Cymbalta, Neurontin, and Duragesic (R. 348).

On December 30, 2008, Dr. Toney treated Plaintiff for "follow-up of chronic pain." Plaintiff reported he was "having troubles with pain that [was] uncontrolled" and he was being treated at WVU Pain Clinic, where they were "only doing injections and not adjusting meds." Dr. Toney noted Plaintiff was in no distress, alert, and oriented, times three (3). His examination of Plaintiff produced normal results. Dr. Toney diagnosed unspecified backache; prescribed Prozac, Neurontin, Baclofen, Cymbalta; and increased Plaintiff's dosage of Duragesic (R. 346).

On January 30, 2009, Plaintiff presented to Dr. Toney for "follow-up of chronic pain." Dr. Toney noted Plaintiff was "doing better with higher [D]uragesic." Plaintiff reported "[b]etter sleep and better pain control." Dr. Toney diagnosed unspecified backache and prescribed Prozac, Neurontin, Baclofen, Duragesic, and Cymbalta (R. 345).

Plaintiff was treated at the UHA Pain Clinic for neck and shoulder pain on March 23, 2009. He reported his pain was sharp, constant, and unchanged (R. 370).

On April 13, 2009, Plaintiff received a "left-sided thoracic medial branch block at T11, T12, and L1 at WVU Pain Clinic. Dr. Navalgund administered the injection (R. 380).

On April 30, 2009, Dr. Toney examined Plaintiff for "back troubles." Plaintiff reported he was going "back . . . [to] Morgantown . . . to see about having permanent procedure done." Plaintiff reported he had undergone radio frequency testing. Plaintiff discussed "wean[ing] off Cymbalta as he was [h]aving troubles with sex drive." On examination, Plaintiff appeared to be in no distress; he was alert and oriented, times three (3). Dr. Toney diagnosed unspecified backache and decreased libido. He prescribed Baclofen, Cymbalta, Duragesic, and Neurontin (R. 343).

On May 4, 2009, Plaintiff was treated at UHA Pain Clinic for mid back, neck and shoulder pain. Plaintiff stated that he had improved and he "[felt] that injection help[ed] him (R. 369).

On May 27, 2009, Plaintiff underwent a "left T11, T12, L1 thoracic radiofrequency ablation" at WVU Pain Clinic (R. 382).

On July 31, 2009, Dr. Toney examined Plaintiff for depressive disorder and backache. Plaintiff reported he had increased pain with weather; he inquired about medicating with Lyrica. Dr. Toney diagnosed unspecified backache. He renewed Plaintiff's prescriptions for Neurontin, Baclofen, Duragesic; he prescribed Lyrica (R. 342).

On August 17, 2009, Dr. Vaglienti examined Plaintiff for complaints of back pain at L1-L2 level. Plaintiff reported the "current episode" with his back pain "started more than 1 year ago." His condition was constant; his pain was not associated with any known injury; and his pain was in his lumbar spine. He described his pain as stabbing, shooting, and aching. The pain radiated to his left thigh. Plaintiff rated his pain at nine (9) on a scale of one-to-ten (1-10). Plaintiff stated his symptoms worsened with bending, twisting and weather. Plaintiff stated he had experienced

13

numbness and weakness. Plaintiff stated he had no leg pain, no paresthesias, no tingling (R. 376). Upon examination of Plaintiff's back, Dr. Vaglienti found Plaintiff's sensation was normal; his gait was antalgic; he had tenderness in the cervical and lumbar areas; his flexion and extension were abnormal; his straight leg raising test was negative bilaterally; his muscle strength was normal. Dr. Vaglienti opined Plaintiff "exhibit[ed] decreased range of motion, tenderness, bony tenderness, pain and spasm" of his lumbar back. His pulse was normal. Dr. Vaglienti made no diagnosis (R. 377).

On August 26, 2009, Plaintiff received a "left medial branch blocks in the lumbar area with fluoroscopic guidance" at WVU Pain Clinic (R. 378).

Administrative Hearing

At the August 26, 2009, administrative hearing, Plaintiff stated he experienced intense pain, dizziness, and loss of concentration due to back pain (R. 42-43).

Plaintiff stated moving "around and being upright" made his pain worse (R. 44). Plaintiff stated a bulging disc in his neck caused his hands and fingers to become numb "at times." Hand numbness caused Plaintiff to drop objects (R. 46, 57). Plaintiff said his depression caused him to forget "things" (R. 47). Plaintiff stated that pain "destroy[ed] [his] concentration." Pain caused him to perspire and lie down (R. 53). Plaintiff stated he had some pain in his left knee, which made it difficult to squat (R. 46). Plaintiff testified he had "good days" when his pain was better than it was on other days. Plaintiff rated his pain as five (5) or six (6) on a scale of one-to-ten (1-10) on a good day and eight (8) on a bad day (R. 54).

Plaintiff testified he had not had surgery on his back. He stated he had been receiving epidural steroid injections once every six (6) weeks) (R. 44). Plaintiff testified that he had scoliosis, for which "corrective surgery" could cause him to "not be able to walk or . . . make[] things much

worse" (R. 42). Plaintiff testified he was taking no medication for depression (R. 45). Plaintiff stated medication caused him to be forgetful (R. 47).

Plaintiff testified he drove a car. He drove two and one-half (2 1/2) hours to the hearing and stopped twice during the travel time (R. 36). Plaintiff testified he worked, repairing radios and video cassette recorders, out of his home for cash (R. 38). Plaintiff did no volunteer work; he belonged to no clubs, organizations, churches, or lodges (R. 38, 51). Plaintiff stated he could walk three (3) or four (4) hundred feet and stand for five (5) or ten (10) minutes. Plaintiff testified he could lift five (5) or seven (7) pounds. Plaintiff said he could sit, without shifting, for five (5) or ten (10) minutes (R. 46). Plaintiff testified he could use a computer until his hands and arms became numb; he used a computer for thirty (30) to forty-five (45) minutes per day (R. 47). Plaintiff testified he had no difficulty "going out around people. . . . [o]ther than not wanting to be around people very much." Plaintiff stated he slept for four (4) or five (5) hours a night before he woke. Plaintiff testified he completed his personal hygiene tasks, but that it was "really painful to do the shower" (R. 48). Plaintiff stated he could prepare "easy" meals. He rose between 8:00 a.m. and 9:00 a.m.; drank coffee; took medication; walked around "a little bit" at 10:00 a.m.; worked on the computer or "tinker[ed] with . . . something"; perhaps "fold some clothes"; perhaps take out garbage; vacuum; and put dishes away (R. 49-50). Plaintiff shopped "once in a while." Plaintiff testified he would salvage parts of electronic devices; clean video heads on video cassette recorders; clean compact disc players; restore old toy cars (R. 50). Plaintiff testified he performed this work about a dozen times per month (R. 52). Plaintiff stated he could not repair cars, do yard work, bike ride, and golf (R. 51). Plaintiff testified he could not do any activity on a "bad" day (R. 55).

The ALJ left the record open for fourteen (14) days so Plaintiff could provide treatment records from the WVU Pain Clinic (R. 34).

The ALJ asked the VE the following hypothetical question:

The . . . hypothetical is that of Judge Alexander . . . in the last hearing that became the final decision of the Commissioner in June of 2006. Light work lifting 20 pounds occasionally, 10 pounds frequently with a sit/stand option. . . . I would like for you to consider 10 minutes each hour. . . . No climbing of any ladders, ropes, or scaffolds. Only occasionally climb ramps, steps, balance, stoop, kneel, crouch, and crawl. . . . Avoid temperature extremes, that would be heat or cold. Now with respect to other non exertionals . . . only simple. . . . [u]nskilled, one to three steps . . . with no rapid production quotas. Now taking that hypothetical into consideration would there be any jobs that you could identify in the national or regional economy . . . that an individual could perform? (R. 61-62).

The VE responded as follows:

Inserting machine operator, 80,000 national, 300 regional. Cleaner/polisher, 75,000 national, 200 regional. Photographic machine operator, 80,000 national, 900 regional. That's a sampling of light, unskilled that fits . . . within the hypothetical as given (R. 62).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Mills made the following findings:

1.  The claimant has not engaged in substantial gainful activity since September 12, 2007, the application date (20 CFR 416.971 *et seq.*) (R. 14).

2.  The claimant has the following severe impairments: thoracolumbar pain with history of strain; mild degenerative joint disease; depression; and Pain Disorder associated with general medical condition (20 CFR 406.920(c)) (R. 14).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926) (R. 14).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that he would require the option to change positions between sitting and standing for ten minutes each hour. He should never climb ladders, ropes or scaffolds and should only occasionally climb ramps and stairs; balance, stoop, kneel, crouch or crawl. He should avoid extremes of heat or cold. The claimant would be limited to perform simple unskilled work involving only one to three step instructions and no rapid production quotas (R. 20).

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965) (R. 22).

6.  The claimant was born on December 19, 1964 and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963) (R. 22).

7.  The claimant has a limited education and is able to communicate in English (20 CFR 416.964) (R. 22).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 22).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)) (R. 22).

10. The claimant has not been under a disability, as defined in the Social Security Act, since September 12, 2007, the date the application was filed (20 CFR 416.920(g)) (R. 23).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties[2]

Plaintiff contends[3]:

_____

[2]Local Rule of Civil Procedure 9.02(g), mandates the following: "References to the Administrative Record: Claims or contentions by the plaintiff alleging deficiencies in the Administrative Law Judge's (ALJ) consideration of claims or alleging mistaken conclusions of fact or law and contentions . . . **must include a specific reference, by page number, to the portion of the record** that (1) recites the ALJ's consideration or conclusion and (2) supports the party's claims, contentions or arguments." In his Memorandum in Support of Motion for Summary Judgment, Plaintiff failed to reference any page number within the administrative record that supported his allegations of error by the ALJ. Plaintiff also failed to name specific evidence which supported his argument. No specific medical records, physicians or psychologists, testimony, or evidence were identified in his brief.

[3]In Plaintiff's Memorandum in Support of Motion for Summary Judgment, he identified, on page two (2), the following three (3) "issues" regarding the decision of the ALJ: 1) "[w]hether the Commissioner erred as a matter of law by finding that the plaintiff is capable of work that exists in substantial numbers in the national economy"; 2) "[w]hether the Commissioner erred as a matter of law by improperly adopting the vocational expert's testimony that was inconsistent with information contained in the Dictionary of Occupational Titles" ; and 3) "[w]hether the Commissioner erred as a matter of law by finding that Mr. Kingston has not been under a disability as defined in the Social Security Act, from 12 September 2007 through the date of this decision." In his argument, however, Plaintiff asserts the ALJ erred in his credibility finding as to Plaintiff and his finding that Plaintiff is capable of work that exists in substantial numbers in

1. The Commissioner erred as a matter of law by discounting the Plaintiff's credibility without providing specific reasons supported by the evidence in the case record.

2. The Commissioner erred as a matter of law by finding that the Plaintiff is capable of work that exits in substantial numbers in the national economy.

The Commissioner contends:

1. The ALJ clearly explained why he discounted Plaintiff's credibility.

2. The ALJ's RFC finding included all credible limitations.

## C. Credibility

Plaintiff raises two arguments relative to the ALJ's credibility analysis. Plaintiff asserts the the ALJ "ignore[d] his duty to consider the consistency of claimant's statements" as mandated in 96-7p. Further, Plaintiff argues that the ALJ "stated that his reasons for questioning the claimant's credibility was (sic) that the objective medical evidence was inconsistent with the (sic) his testimony. Specifically, the ALJ found that the claimant worked from 1996-2007 and that there was 'nothing in the record to show that any objective change in the claimant's back condition since his injury in 1996 and since his last objective study in 2003, and nothing objective to support the claimant's testimony that his back pain has increased in frequency and intensity. . . .' For the Judge to discount his credibility simply because no objective medical test had been performed falls far short of the standards set . . ." (Plaintiff's brief at pp. 5-6). A thorough reading of the ALJ's decision by the undersigned revealed that this assertion by Plaintiff is in error. Specifically, the above quote, attributed to the ALJ as recited by Plaintiff in his brief, does not exist in the decision. Further,

the national economy (Plaintiff's brief at pp. 5-9). The undersigned, therefore, finds the Plaintiff abandoned his contention as to alleged error on the part of the Commissioner that the VE's testimony was inconsistent with the DOT and does not address it in this Report and Recommendation.

Defendant asserts the "ALJ did an excellent job in articulating why he discounted Plaintiff's credibility regarding the extent of his alleged pain" (Defendant's brief at p. 10). The undersigned agrees with Defendant and further finds that the ALJ's decision as to Plaintiff's credibility is thorough, accurate and supported by substantial evidence.

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (1984) (citing *Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va. 1976). The ALJ has a "'duty of explanation'" when making determinations about credibility of the claimant's testimony." See *Smith v. Heckler*, 782 F.2d 1176, 1181 (4th Cir. 1986) citing *DeLoatche v. Heckler*, 715 F.2d 148, 150-51 (4th Cir. 1983); see also *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Additionally, 20 C.F.R. 404.1529(c) mandates that the ALJ may consider the medical evidence, including objective findings and opinion evidence, in assessing claimant's credibility. In the instant case, as noted below, the ALJ fully explained his determination relative to Plaintiff's credibility. In making that determination, the ALJ considered and evaluated the objective findings and opinion evidence of record as well as the consistency of Plaintiff's statements.

In his decision, the ALJ made the following finding:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extend they are inconsistent with the above residual functional capacity assessment (R. 21).

> In terms of the claimant's alleged musculoskeletal pain, the undersigned notes that the objective medical signs and findings do not fully support the claimant's allegations as to the intensity, persistence and limiting effects of his symptoms. The x-ray and MRI studies have not indicated more than mild degenerative changes in

any area of the spine, and EMG testing has been negative. The claimant's neurological examinations have been normal for the most part. The claimant's testimony that he has scoliosis that will require surgery and possibly render him unable to walk is not supported by any of the medical evidence. Dr. Epstein noted mild kyphoscoliosis on her examination, but she said nothing about surgery being needed for this (Exhibit C-1F). The claimant's report that he has trouble squatting due to left knee problems is also not supported by any objective medical evidence. There is no evidence that the claimant has reported having any knee problems to his treating physicians, and no knee abnormalities have been seen on examination. The claimant reports problems with dizziness and sweating, but the only possible cause noted for this in the record would be medication side effects. The undersigned has considered the claimant's level of pain in reaching a decision regarding his maximum residual functional capacity, but finds that the objective medical evidence simply does not support the claimant's testimony regarding the extent of his pain and the limitations it has caused (R. 21-22).

The above detailed discussion demonstrates that the ALJ considered the objective medical evidence that were completed on Plaintiff and that discussion was comprehensive. The ALJ considered Plaintiff's February, 2007, MRI of his cervical spine, which showed mild degenerative changes; Plaintiff's February, 2007, MRI of his thoracic spine, which showed "very mild degenerative changes"; Dr. Pawar's opinion that a MRI of his lower back had been normal; Dr. Pawar's opinion that Plaintiff's February, 2001, x-ray showed L1-L2 disk bulge and normal thoracic spine; and Plaintiff's April, 2007, EMG and neuropathy panel, which were normal (R. 15). The ALJ considered the neurological findings of Dr. Epstein, who noted Plaintiff's cranial nerves were intact; his motor strength was normal; his pinprick of mid-thoracic spine was normal; and his Romberg test was negative. The ALJ considered the neurological findings of Dr. Pawar, who noted Plaintiff had "some hyperesthesia in the right T-10 level," decreased pinprick, normal muscle tone, normal strength, and intact cranial nerves (R. 15). The ALJ considered the neurological findings of Dr. Beard, who noted that Plaintiff's dorsalis pedis and posterior tibial pulses were palpable; he had no spinous process, muscular tenderness or spasm of his cervical spine; his sensation was intact; and

he had no weakness (R. 16). The ALJ considered the neurological findings of Dr. Toney, who noted that Plaintiff's peripheral pulses were intact (R. 16). The undersigned finds that the ALJ's determination as to Plaintiff's credibility is supported by the objective evidence of record and that the ALJ thoroughly and correctly analyzed and considered that evidence.

In his decision, the ALJ considered the opinion evidence of Dr. Epstein, Dr. Pawar, Dr. Beard, and Dr. Toney, Dr. Stein, and the opinions of those who treated Plaintiff at the pain clinics. The ALJ noted that Dr. Epstein found Plaintiff's gait was normal on January 3, 2007. Dr. Epstein diagnosed thoracic degenerative disc disease, which did not cause any nerve root compression or spinal stenosis; degenerative disc disease of the lumbosacral spine, which did not cause any nerve root compression; mild kyphoscoliosis; and thoracic sprain with spasm. Dr. Epstein opined Plaintiff was not a surgical candidate (R. 15, 21). The ALJ evaluated Dr. Pawar's opinion that Plaintiff's gait was stiff on January 11, 2007, and that he had "questionable dysmetria on finger-to-nose testing." Dr. Pawar's found "some hyperesthesia in the right T10 level on anesthesia and the left T10 level." Dr. Pawar diagnosed small fiber neuropathy and recommended consultation with pain management (R. 15). The ALJ discussed the opinions of Dr. Beard, who found, on December 17, 2007, that Plaintiff's range of motion was normal; he was able to button, pick up coins with both hands, and write with his dominant hand with no difficulty; he flexed to "55 degrees with normal lumbosacral spine motion otherwise"; he could stand on one leg at a time with no difficulty; his straight leg raising test was "to 90 degrees bilaterally in the seated and supine positions with back pain and was considered negative"; and he had normal range of motion of hips. Dr. Beard found no radiculopathy. Dr. Beard diagnosed Plaintiff with "chronic thoracolumbar pain with a history of thoracolumbar strain" (R. 16). The ALJ considered the opinion of Dr. Toney, who diagnosed Plaintiff with

22

unspecified backache and who found Plaintiff's peripheral pulses were intact (R. 16-17). The ALJ evaluated the opinions of the pain management professionals who treated Plaintiff at UHA Pain Clinic. Plaintiff was diagnosed with cervical and lumbar degenerative disc disease. The ALJ "[found] it significant that the Pain Clinic refused to prescribe narcotics for the claimant's pain" (R. 17). The ALJ evaluated the opinions of Dr. Stein, who found Plaintiff was cooperative; his speech was normal; his mood was mildly depressed; his affect was subdued; his immediate and remote memories were mildly deficient; his concentration was poor; he was of average intelligence; his concentration as mildly impaired; his pace was moderately slow; his persistence was mildly deficient; he had average insight and judgment; and his social functioning was mildly deficient. Dr. Stein diagnosed major depression, recurrent and nonpsychotic, and pain disorder (R. 17-18).

SSR 96-7p reads, as follows, in part:

PURPOSE: The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effect; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:

1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms

23

has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

. . .

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence

Plaintiff's argument that the ALJ "ignore[d] his duty to consider the consistency of the claimant's statements" is without merit. Plaintiff asserts that "[s]uch statements can be found both in this proceeding and in statements made to his medical providers over a period of more than ten years" (Plaintiff's brief at pp. 6-7)[4]. The ALJ systematically evaluated Plaintiff's statements about the intensity and persistence of his pain in conformance with SSR 96-7p and noted their inconsistencies with the evidence or record or with Plaintiff's own statements.

---

[4]As noted above, the June 5, 2006, decision by ALJ Alexander is final and evidence from the previously decided period, May 15, 1996, through June 5, 2006, is not reconsidered in this decision. *Albright,* supra at 476. Additionally, as noted above, Plaintiff did not refer to any evidence of record to support this contention.

The ALJ evaluated Plaintiff's January 3, 2007, complaints to Dr. Epstein of "mid-thoracic pain with reports of 'acute attacks every three to four days with spasms and sweating' and intermittent tingling from the mid-thoracic area down into the groan (sic) and legs" and "twitching in his face and arms" and found they were not supported by Dr. Epstein's findings or diagnosis. Dr. Epstein diagnosed thoracic degenerative disc disease, which did not cause any nerve root compression or spinal stenosis; degenerative disc disease of the lumbosacral spine, which did not cause any nerve root compression; mild kyphoscoliosis; and thoracic sprain with spasm. Dr. Epstein opined Plaintiff was not a surgical candidate (R. 15, 21).

The ALJ considered Plaintiff's statement to Dr. Pawar on January 11, 2007, just eight days after he registered his less-severe complaints to Dr. Epstein, that he had "numbness and tingling in his legs, stomach and groin as well as intense sweating fits, balance problems, and jerking and kicking in his sleep." The ALJ found Plaintiff's complaints were not consistent with the objective medical evidence that Dr. Pawar ordered and evaluated. Specifically, the EMG was negative; the February 15, 2007, MRI of Plaintiff's cervical spine showed "mild degenerative changes"; the February 15, 2007, MRI of Plaintiff's thoracic spine showed "very mild degenerative changes"; and the April 12, 2007, MRI of Plaintiff's lower back was normal (R. 15).

The ALJ considered Plaintiff's complaints of numbness and tingling in his mid-back, hands, legs and feet as well as mid-back pain" on June 25, 2007, to his pain specialist at United Pain Management, but opined that the "only abnormal finding noted at that time was lumbar paraspinal muscle spasm"; his neuropathy panel and EMG were negative; and Plaintiff "was diagnosed with lumbago; myofacial pain syndrome; and peripheral neuropathy." Plaintiff reported "some improvement with the use of Cymbalta" and his dosage was increased (R. 16).

The ALJ considered Plaintiff's February 25, 2008, statement to his physical therapist that he was "feeling much better with increased aquatic exercises, and he stated that being able to exercise had made his activities of daily living consistently easier to tolerate" (R. 16-17).

The ALJ evaluated Plaintiff's May 13, 2008, statement to his pain management specialist at UHA Pain Clinic that he had realized "some mild relief of his neck pain . . . ." Plaintiff reported that the "Demerol he received at the ER had helped his pain." The physician at the pain clinic "stated that the claimant would not be given narcotics." The ALJ found "it significant that the Pain Clinic refused to prescribe narcotics for the claimant's pain" and that the records from the UHA Pain Clinic "fail[ed] to establish the presence of any major abnormal findings regarding the spine" (R. 17).

The ALJ considered Plaintiff's statements to Dr. Toney. Plaintiff reported to Dr. Toney on June 30, 2008, that he "still" experienced a "significant amount of pain"; however, Dr. Toney "noted that the claimant's last pain clinic consultation had specified no narcotics." Plaintiff reported to Dr. Toney on January 30, 2009, that he had "better sleep and pain control with the increased Duragesic." Then, on July 31, 2009, Plaintiff stated to Dr. Toney that he was experiencing "increased pain due to the weather, and stated that he would like to try Lyrica." Dr. Toney prescribed Lyrica. The ALJ found that "given the lack of any significant physical findings reported by Dr. Toney," who consistently diagnosed "unspecified backache" but conducted no exertional or non-exertional testing of Plaintiff, "it is unclear as to why he continued to prescribe narcotics to the claimant, particularly given the Pain Clinic's refusal to do so. It appears that Dr. Toney was responding to the claimant's subjective complaints of pain despite the lack of objective findings" (R. 17).

The ALJ also discussed the March 23, 2009, diagnosis from UHA Pain Clinic that Plaintiff had "cervical and lumbar degenerative disc disease; cervical stenosis; myofacial pain syndrome,

improved; and thoracic sprain, improved." After that diagnoses, on May 4, 2009, Plaintiff stated that "the epidural steroid injections . . . helped his pain" (R. 17).

The ALJ considered Plaintiff's statements to Dr. Stein and found them inconsistent. Plaintiff stated that his concentration was affected by pain and he had eating and sleeping disturbances, had poor energy, had been "treated for depression since 2003," and did no yard work or gardening. Plaintiff's activities of daily living demonstrated a greater ability. Plaintiff occasionally went grocery shopping, ran errands, drove a car, walked short distances, "spent his days checking the computer," washed dishes, did laundry, watched television, napped, and occasionally sat on the porch. The ALJ found that "while the claimant told Dr. Stein that he was undergoing mental health treatment, there is no evidence in connection with the claimant's current application for benefits that he has been seen by any mental health practitioner, although he has been prescribed antidepressants by Dr. Toney, who diagnosed him with a Depressive Disorder. The claimant testified at the hearing that he had last been seen by a mental health professional around 2004" (R. 18).

Finally, the ALJ noted the inconsistency in Plaintiff's statements and the record of Dr. Epstein. The ALJ evaluated Plaintiff's "testimony that he has scoliosis that will require surgery and possibly render him unable to walk" and found it "[was] not supported by any medical evidence. Dr. Epstein noted mild kyphoscoliosis on her examination, but she said nothing about surgery being needed for this (R. 21).

For all the above stated reasons, the ALJ's finding that Plaintiff's statements concerning the intensity, persistence and limiting effects of his pain are not credible is supported by substantial evidence.

### D. Hypothetical

Plaintiff asserts the ALJ erred by finding that Plaintiff is capable of work that exists in substantial numbers. Specifically, Plaintiff argues "the ALJ proposed a series of hypothetical questions to the vocational expert to determine if there were a significant number of jobs in the national economy which claimant could perform with restrictions identified by the judge. In large part due to the ALJ's improper discounting of the claimant's credibility discusses (sic) above, however, the ALJ failed to adequately include the limitations presented by the claimant's impairments in hypotheticals to the VE" (Plaintiff's brief at pp. 7-8). The Plaintiff did not support this argument with any specific references to the record or by naming any specific limitations not included in the hypothetical. Defendant asserts the ALJ's residual functional capacity findings included all credible limitations (Defendant's brief at p. 11).

20 C.F.R. §416.945 holds, in part, the following:

*Your residual functional capacity.*

(a) *General*—(1) *Residual functional capacity assessment.* Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record. (*See* §416.946.)

. . .

(3) *Evidence we use to assess your residual functional capacity.* We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (*See* §416.912(c).)

The ALJ found Plaintiff had the following residual functional capacity:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that he would require the option to change positions between

28

sitting and standing for ten minutes each hour. He should never climb ladders, ropes or scaffolds and should only occasionally climb ramps and stairs; balance, stoop, kneel, crouch or crawl. He should avoid extremes of heat or cold. The claimant would be limited to perform simple unskilled work involving only one to three step instructions and no rapid production quotas (R. 20).

The Fourth Circuit has held the following:

> The purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform. In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, *Chester v. Mathews,* 403 F.Supp. 110 (D.Md.1975), and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments. *Stephens v. Secretary of Health, Education and Welfare,* 603 F.2d 36 (8th Cir.1979).

> In addition, the opinion of a vocational expert must be based on more than just the claimant's testimony--it should be based on the claimant's condition as gleaned from the entire record.

*Walker v. Bowen*, 876 F.2d 1097, 1100-01 (1989).

Based on the above residual functional capacity, the ALJ asked the VE the following hypothetical question:

> The . . . hypothetical is that of Judge Alexander . . . in the last hearing that became the final decision of the Commissioner in June of 2006. Light work lifting 20 pounds occasionally, 10 pounds frequently with a sit/stand option. . . . I would like for you to consider 10 minutes each hour. . . . No climbing of any ladders, ropes, or scaffolds. Only occasionally climb ramps, steps, balance, stoop, kneel, crouch, and crawl. . . . Avoid temperature extremes, that would be heat or cold. Now with respect to other non exertionals . . . only simple. . . . [u]nskilled, one to three steps . . . with no rapid production quotas. Now taking that hypothetical into consideration would there be any jobs that you could identify in the national or regional economy . . . that an individual could perform? (R. 61-62).

*In Koonce v. Apfel*, 166 F.3d 1209 (4th Cir. 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence of record. The ALJ's hypothetical question to the VE is based on the evidence of record and fairly sets out all of Plaintiff's impairments that are supported by the record.

29

The ALJ considered the following objective and opinion evidence of record to formulate his

RFC and hypothetical question:

- Dr. Epstein's finding that Plaintiff's Romberg testing was negative, cranial nerves were intact, motor strength was normal, gait was normal, and he had no nerve root compression or spinal stenosis (R. 15).

- Dr. Pawar's findings that Plaintiff's cranial nerves were intact, gait was hesitant and stiff, finger-to-nose testing produced "questionable dysmetria," muscle strength was normal, muscle tone was normal, and pinprick and vibration tests were decreased distally (R. 15).

- Dr. Pawar's diagnosis of small fiber neuropathy (R. 15).

- February 15, 2007, MRI of Plaintiff's cervical spine, which showed mild degenerative changes (R. 15).

- February 15, 2007, MRI of Plaintiff's thoracic spine, which showed "very mild degenerative changes" (R. 15).

- Dr. Pawar's opinion that a "MRI of the lower back had been normal" (R. 15).

- Negative EMG test results and normal blood tests (R. 15).

- Findings from United Pain Management that Plaintiff had lumbago, myofacial pain syndrome, and peripheral neuropathy (R. 16).

- Dr. Beard's findings that Plaintiff's gait was mildly stiff and without a limp; he required no ambulatory aid; he was able to stand; he could rise from a seated position; he could get on and down from the examination table; his dorsalis pedis and posterior tibial pulses were palpable; he had no spinous process or muscular tenderness or spasm; his range of motion was normal; he could pick up coins and button with both hands; he could write with his dominant hand; he flexed "to 55 degrees with normal lumbosacral spine motion otherwise"; he could stand on one leg at a time; his straight leg raising test was "to 90 degrees bilaterally in the seated and supine positions . . . and was considered negative"; his hips range of motion were normal; he had no weakness on manual muscle testing; his sensation was intact; he could heel walk, toe walk, tandem walk; he could squat with pain (R. 16).

- Findings at University Health Associates Pain Clinic that Plaintiff's strength was 5/5, his deep tendon reflexes were 2+, and his toes were down going; Plaintiff was diagnosed with cervical and lumbar degenerative disc disease,

cervical stenosis, myofacial pain syndrome, improved, and thoracic pain, improved (R. 17).

- Dr. Toney's perpetual diagnoses of "unspecified backache"(R. 17).

In addition to the objective and opinion evidence, the ALJ considered Plaintiff's statements that he could "prepare easy foods"; he walked "around to see how he [felt] and look[ed] for something to do"; he worked on a computer or "tinker[ed] with something broken"; he could fold clothes; he could take out garbage; he could sometimes vacuum; he could sometimes put away dishes; he shopped for "a few items"; he restored old toy cars; he cleaned heads on VCRs; he could walk three-hundred-to-four-hundred (300-400) feet at a time; he had difficulty squatting; he could stand for five (5) or ten (10) minutes; he could lift five (5) or seven (7) pounds; he could sit for five (5) or ten (10) minutes without shifting; he had "memory problems which he attributed mainly to his medications"; he "use[d] a computer 30 to 45 minutes per day"; and he did not "want to be around people" (R. 21).

The ALJ thoroughly evaluated the opinion evidence of Drs. Beard, Pawar, Toney and Epstein; the opinions of the medical professionals who treated Plaintiff at pain clinics; and the objective medical evidence. None of these physicians opined Plaintiff could not work; the objective medical evidence does not support a finding of disability. As to Plaintiff's statements, he specifically testified that he worked on the computer, he repaired VCRs, and he restored toy cars. This evidence supports the ALJ's hypothetical question that provided Plaintiff could perform light work.

Plaintiff also asserts that the ALJ "did not pose appropriate questions to the VE regarding how [Plaintiff's] pain would affect [his] . . . ability to maintain concentration, persistence, and pace on the job" (Plaintiff's brief at p. 8). The ALJ "considered the opinion of Dr. Stein[] and [found] that it is reasonable and well-supported by the objective medical evidence and by the mental status

evaluation he performed" (R. 22). That evaluation of Dr. Stein contained the opinion that Plaintiff's concentration was mildly impaired; his pace was moderately slow; and he had mildly deficient persistence (R. 18, 289). The ALJ further found that "[w]ith regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant reports problems with concentration related to medication side effects. Dr. Stein's evaluation indicated some mild to moderate memory problems, and Dr. Stein opined that the claimant had mild to moderate deficits in concentration, persistence, or pace . . . . The undersigned finds that the claimant may be moderately limited in this area of functioning during periods of symptom exacerbation" (R. 19). Based on this, the ALJ included the following in his RFC: "The claimant would be limited to perform simple unskilled work involving only one to three step instructions and no rapid production quotas" (R. 20). In his hypothetical to the VE, the ALJ asked the following: "Now with respect to other non exertionals . . . only simple. . . . [u]nskilled, one to three steps . . . with no rapid production quotas. Now taking that hypothetical into consideration would there be any jobs that you could identify in the national or regional economy . . . that an individual could perform?" (R. 61-62).

The Fourth Circuit has not squarely addressed the issue of what language must be included in a hypothetical question when a plaintiff has a moderate limitation in his or her ability to maintain concentration, persistence, or pace; however, other circuits have. The Eighth Circuit, in *Brachtel v. Apfel*, 132 F.3d 417 (1997), held that a hypothetical question that included the ability "to do only simple routine repetitive work, which does not require close attention to detail [and] no[] work at more than a regular pace" was sufficient for a claimant who "often" exhibited limitations of concentration, persistence, or pace. The Eighth Circuit also held, in *Howard v. Massanair*, 255 F.3d 577 (2001), that a hypothetical, "upon which . . . (the ALJ) relied to deny social security claimant

disability and supplemental security income benefits, which assumed that claimant was able to do simple, routine, repetitive work, adequately captured claimant's deficiencies in concentration, persistence, or pace, and thus, was substantial evidence to support award or denial of social security disability benefits." In the instant case, it is evident that the ALJ included, in his RFC and in his hypothetical question to the VE, limitations that accommodated Plaintiff's ability to maintain concentration, persistence and pace. The ALJ considered Dr. Stein's finding and accommodated them by including simple, unskilled, one-to-three (1-3) step work that required no rapid production quotas. The undersigned finds the ALJ adequately addressed limitations caused by Plaintiff's ability to maintain concentration, persistence and pace in his hypothetical question to the VE.

For all the above stated reasons, the undersigned finds the ALJ's hypothetical question to the VE is supported by substantial evidence.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is supported by substantial evidence, and I accordingly recommend that the Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the

Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record

Respectfully submitted this _3_ day of _October_ , 2011.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE